UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
UNITED STATES OF AMERICA,       :
                :
                :
         v.          :    Case No. 07-CR-1062 (NRB)
                :
IVY WOOLF TURK,         :
                :
         Defendant.   :
-------------------------------------------------------------x

### *AMICI CURIAE* BRIEF OF
### THE NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS,
### THE NEW YORK STATE ASSOCIATION OF CRIMINAL DEFENSE LAWYERS, AND
### <u>THE NEW YORK COUNCIL OF DEFENSE LAWYERS</u>

Lawrence S. Bader
Robert M. Radick
Claudio Ochoa
MORVILLO, ABRAMOWITZ, GRAND,
IASON, ANELLO & BOHRER, P.C.
565 Fifth Avenue
New York, NY 10017
(212) 856-9600

Richard D. Willstatter
Vice-Chair, Amicus Curiae Committee
NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS
Vice-President
NEW YORK STATE ASSOCIATION OF
CRIMINAL DEFENSE LAWYERS

Barry A. Bohrer
President
NEW YORK COUNCIL OF DEFENSE
LAWYERS

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... ii

INTEREST OF *AMICI CURIAE* AND INTRODUCTION ........................................... 1

I.   THE GUIDELINES AND SECOND CIRCUIT PRECEDENT
     APPLYING PROXIMATE CAUSE PRINCIPLES .................................................. 4

II.  THE GOVERNMENT'S EFFORTS TO LIMIT PROXIMATE CAUSE
     ANALYSIS TO SECURITIES FRAUD CASES ARE
     UNCONVINCING AND UNSUPPORTED ........................................................... 7

     A.   In Calculating Loss Under Guidelines Section 2B1.1, There is
          No Distinction Between Schemes Involving "Lender" Victims
          and "Equity Investor" Victims .................................................... 8

     B.   The Application of Proximate Cause Prinicples in All Fraud
          Cases is Not a Novel Extension of the Law ................................... 12

     C.   The Government Misapprehends *Ebbers* In Attempting to
          Apply But-For Causation .......................................................... 16

III. APPLICATION OF PROXIMATE CAUSE PRINCIPLES WILL
     AVOID UNJUST RESULTS THAT CONFLICT WITH THE
     PURPOSES OF THE GUIDELINES .................................................................. 18

CONCLUSION ........................................................................................... 21

# TABLE OF AUTHORITIES

Page

## CASE LAW

Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005) ..............................................8

Rita v. United States, 551 U.S. 338 (2007) ...........................................................................2

United States v. Adelson, 441 F.Supp.2d 506 (S.D.N.Y. 2006)..............................4, 19, 20

United States v. Booker, 543 U.S. 220 (2005) ......................................................................2

United States v. Confredo, 528 F.3d 143 (2d Cir 2008 ........................................................1

United States v. Ebbers, 458 F.3d 110 (2d. Cir. 2006)...3, 6, 7, 9, 11, 13, 14, 15, 17, 18, 19

United States v. Hicks, 217 F.3d 1038 (9th Cir. 2000) ......................................................15

United States v. Marlatt, 24 F.3d 1005 (7th Cir. 1994) .........................................15, 16, 17

United States v. Nacchio, 573 F.3d 1062 (10th Cir. 2009) .........................................12, 13

United States. v. Olis, 429 F.3d 540 (5th Cir. 2005) .........................................6, 13, 14, 15

United States v. Parris, 573 F.Supp.2d 744 (E.D.N.Y. 2008) ............................4, 5, 19, 20

United States v. Rutkoske, 506 F.3d 170 (2d Cir. 2007)............................3, 6, 7, 8, 13, 15

United States v. West Coast Aluminum Heat Treating Co., 265 F.3d 986 (9th Cir. 2001)................................................................................................................................14

United States v. Zolp, 479 F.3d 715(9th Cir. 2007) .............................................................6

## MISCELLANEOUS

Brief of Plaintiff-Appellee, United States v. Olis, 429 F.3d 540 (No. 04-20322).............17

Government Sentencing Memorandum ..............................................................3, 9, 10, 18

United States Sentencing Guidelines Manual.....................................................................3

United States Sentencing Guidelines Manual § 2B1.1(b)(2008).....4, 5, 6, 8, 10, 11, 16, 18

United States Sentencing Guidelines Manual ch.2, pt. B, Introductory Comment
    (2008).........................................................................................................................10

United States Sentencing Guidelines Supplement 2 App.C, Amendment 617
    (November 1, 2001).......................................................................................11, 12, 17

Wayne R. Lafave, Substantive Criminal Law, § 6.4© (2d ed. 2003)................................13

### INTEREST OF *AMICI CURIAE* AND INTRODUCTION

The National Association of Criminal Defense Lawyers ("NACDL") is the nation's preeminent professional bar association of criminal defense attorneys. Founded in 1958, the Association has 12,000-plus direct members in 28 countries—and 90 state, provincial, and local affiliate organizations totaling more than 40,000 attorneys, who are private lawyers, public defenders, and military defense counsel. They and the NACDL seek to ensure justice for all criminal defendants.

The New York State Association of Criminal Defense Lawyers, ("NYSACDL"), formed in 1986, is a statewide organization of more than 850 attorneys. The NYSACDL is responsive to the needs of private practitioners as well as public defenders, and is dedicated to assuring equal protection of individual rights and liberties for all. The NYSACDL is one of the NACDL's largest affiliates.

The New York Council of Defense Lawyers ("NYCDL") is a not-for-profit professional association of approximately 240 lawyers, many of whom are former prosecutors, whose principal area of practice is criminal defense in federal and state courts in New York. NYCDL's mission includes protecting the individual rights guaranteed by the Constitution, enhancing the quality of defense representation, and promoting the proper administration of criminal justice. As amicus, NYCDL offers the Court the perspective of practitioners who regularly handle some of the most complex and significant white collar criminal cases in federal and state courts. NYCDL's amicus briefs have been cited by the Court or concurring justices in cases such as Rita v. United States, 551 U.S. 338, 373 (2007) (Scalia, J., concurring in the judgment), and United States v. Booker, 543 U.S. 220, 266 (2005).

This case raises questions of great interest to the *amici* organizations regarding the loss analysis to be applied under the United States Sentencing Guidelines ("Guidelines") in cases involving fraud.[1]  In its response to the sentencing submission of defendant Ivy Woolf Turk, the government acknowledges a line of Second Circuit cases holding that defendants are responsible only for those losses that result from their particular offense conduct, rather than for losses that are caused by outside forces.  See, e.g., United States v. Ebbers, 458 F.3d 110, 128 (2d Cir. 2006) ("Losses from causes other than the fraud must be excluded from the loss calculation."); United States v. Rutkoske, 506 F.3d 170 (2d Cir. 2007) (remanding because the district court failed to consider how factors other than defendant's fraud contributed to the decline of the company's stock price).   However, the government then argues that this fundamental principle is limited to the narrow context of securities fraud matters.  Gov't Sentencing Memorandum at 5-6. In other words, the government contends that while defendants charged with securities fraud should receive the benefit of proximate cause principles adopted by the United States Sentencing Commission ("Sentencing Commission") and articulated by various courts of appeals (including the Second Circuit), defendants in all other types of fraud cases are not entitled to such a loss analysis, and should instead be sentenced based on even those losses that their conduct did not proximately cause.

The government's position is not only unsupported, but also would create significant injustice.  It can hardly be disputed that the Guidelines were intended to establish a principled system in which sentencing decisions would be premised upon a defendant's culpability, and in cases involving fraud, culpability is gauged primarily by the loss table set forth in Guidelines

---

[1] This *amici curiae* brief is limited solely to legal issues regarding loss causation under the Guidelines.  The *amici* organizations take no position as to the factual and other legal disputes at issue between the parties.

Section 2B1.1(b).  However, subject to certain exceptions that are not relevant here, the method of applying the loss table does not turn on the type of fraud a defendant has committed.  To the contrary, the Guidelines, case law and principles of fundamental fairness each require that defendants who are to be sentenced pursuant to Section 2B1.1(b) be held accountable only for those losses that bear a sufficient causal link to their offense, and the government's efforts to limit proximate cause analysis to securities fraud cases cannot be squared with the weight of this authority.

Further, the limitation of principles of proximate causation to only securities fraud cases would also cause what other courts have recognized as the "utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic."  United States v. Adelson, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006); United States v. Parris, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) ("While I acknowledge that the Guidelines 'reflect Congress' judgment as to the appropriate national policy for such crimes,' this does not mean that the Sentencing Guidelines for white-collar crimes should be a black stain on common sense.") (internal citation omitted).  As explained in more detail below, calculating actual loss using a methodology that identifies the losses that the defendant's fraud actually caused is not only consistent with well-established precedent, but also represents an approach to sentencing that is "cabined by common sense" and will result in sentences that are just and reasonable under the circumstances presented.  Adelson, 441 F. Supp. 2d at 512.

In addressing the issues raised by the government's sentencing submission, this memorandum of law is divided into three main parts.  First, the memorandum discusses the body of well-settled law in which the Second Circuit has held that defendants are to be sentenced based only upon those losses that their conduct proximately caused.  Second, the memorandum

3

addresses the government's attempt to limit this loss causation analysis to the narrow area of

securities fraud matters, and demonstrates the unpersuasive nature of the government's efforts.

Third and last, the memorandum discusses the manner in which the government's position, if

adopted, would undermine the purposes of the Guidelines, and would result in the types of

exceedingly lengthy and egregiously harsh sentences that are a "black stain on common sense."

Parris, 573 F. Supp. 2d at 754.

## I.      THE GUIDELINES AND SECOND CIRCUIT PRECEDENT APPLYING PROXIMATE CAUSE PRINCIPLES

Section 2B1.1(b) of the Guidelines provides for an enhancement of a fraud defendant's

offense level based upon, among other factors, the amount of losses involved. The amount of

loss attributed to the defendant significantly impacts a defendant's Guidelines calculation—while

a loss of more than $5,000 will lead to a 2 level enhancement, a loss of more than $1 million will

cause a 16 level enhancement, and a loss of more than $20 million will cause a 22 level

enhancement. U.S. Sentencing Guidelines Manual § 2B1.1(b)(1) (2008). In the commentary to

Section 2B1.1, the Sentencing Commission explained that, for purposes of this loss table, losses

should be calculated based upon either the actual loss or intended loss from the offense,

whichever is greater. (The government concedes that "intended loss" is "irrelevant" in this case.

Gov't Sentencing Memorandum at 14.) Actual loss is defined as "the reasonably foreseeable

pecuniary harm that resulted from the offense." U.S. Sentencing Guidelines Manual § 2B1.1

cmt. n.3(A)(i). The wording of Application Note 3(A)(ii) suggests that "actual loss" under

Section 2B1.1 has three components: pecuniary harm to the victim(s), that such harm was

"reasonably foreseeable," and that the pecuniary harm must have resulted from the offense.

In what is now a firmly settled body of case law, the Second Circuit set forth the

appropriate means by which sentencing courts applying Section 2B1.1 are to reach reasonable

estimates of both intended and actual losses resulting from an offense.  The calculation of actual

loss requires a purely objective assessment of the cause of the losses.  In cases in which actual

loss is used as the measurement of losses for purposes of Section 2B1.1(b), the case law has

followed the text of the Guidelines' Application Notes in holding that "[t]he loss must be the

result of the fraud," and "[l]osses from causes other than the fraud must be excluded from the

loss calculation." Ebbers, 458 F.3d at 128 (citation omitted).  This means that losses caused by a

defendant's criminal conduct must be untangled from losses caused by outside events such as

market forces, and the losses caused by such outside forces must not be included in the

Guidelines calculation. Rutkoske, 506 F.3d at 179; see also United States v. Zolp, 479 F.3d 715,

719 (9th Cir. 2007) ("[T]he court must disentangle the underlying value of the stock, inflation of

that value due to the fraud, and either inflation or deflation of that value due to unrelated

causes.").  In other words, where the revelation of a fraud coincides with or is followed by a

decline in the market value of an asset, thereby resulting in a loss to investors, actual loss is to

include only that portion of the decline in value that is directly attributable to the fraud. See

Ebbers, 458 F.3d at 128 (citing United States v. Olis, 429 F.3d 540 (5th Cir. 2005)).

The Second Circuit's decision in United States v. Ebbers provides a clear demonstration

of these fundamental principles.  Ebbers, the former CEO of WorldCom, Inc., was convicted of a

massive fraud that artificially inflated the company's stock price.  For purposes of Ebbers's

Guidelines loss calculation, the court took a narrow view of the loss attributable to Ebbers's

fraud, explaining that actual loss consisted only of the losses "suffered by those investors who

bought or held WorldCom stock during the fraud period either in express reliance on the

accuracy of the [company's] financial statements or in reliance on what Basic, Inc. v. Levinson

described as the 'integrity' of the existing market place." Ebbers, 458 F.3d at 126-27.  The

Second Circuit further held that losses attributable to other causes, such as outside market pressures on the price of WorldCom stock, could <u>not</u> be included in the amount of actual loss used to enhance Ebbers's sentence. <u>Id.</u> at 128. Given the dramatic scale of the fraud in the Ebbers case, the exclusion of losses caused by outside forces had no practical effect, because even a correct actual loss calculation resulted in a loss figure that exceeded the top of the Guidelines. Nonetheless, the court clearly cautioned that sentencing courts must untangle the numerous factors that could contribute to victim losses, and thereby ensure that defendants are sentenced only on the basis of losses their specific criminal conduct actually caused. <u>Id.</u> ("Many factors causing a decline in a company's performance may become publicly known around the time of the fraud and be one cause in the difference in price between X-day and Y-day. . . . Losses from causes other than the fraud must be excluded from the loss calculation.").

The Second Circuit's subsequent decision in <u>United States v. Rutkoske</u> further underscores this point. Rutkoske had been the owner of a brokerage firm that encouraged its customers to invest in a company known as NetBet, the stock of which Rutkoske's firm not only owned but also manipulated. When NetBet's stock price collapsed, the brokerage firm's customers lost over $12 million. To calculate actual losses for sentencing purposes, the district court used the difference between the stock price at the time the conspiracy began and on the last date for which the parties had price information for the stock from market makers, which was after the conspiracy ended. On appeal, the Second Circuit found this to be reversible error, because the district court's actual loss calculation had "implicitly attributed the total amount of the decline in the value of NetBet shares to Rutkoske's offense conduct" without considering or accounting for the impact of non-fraud causes for the decline. <u>Rutkoske</u>, 506 F.3d at 178.

As the Second Circuit stated, while there are "complexities inherent in calculating the loss amount . . . the loss [for which a defendant is sentenced] must be the result of the fraud." Id. at 179 (citation and quotation marks omitted).[2]

In Rutkoske, the Second Circuit also noted that the analysis of loss causation in civil securities fraud cases "provides useful guidance" in calculating actual loss for criminal sentencing purposes. 506 F.3d at 179. Specifically, the Rutkoske court noted that in Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005), the Supreme Court explained that a civil securities fraud plaintiff "must prove that the [defendant's] misrepresentation proximately caused the economic loss" to establish securities fraud, and that this requirement eliminated the possibility that a defendant would be held liable for losses caused by outside market forces. Rutkoske, 506 F.3d at 179. Given that a defendant may be sentenced only on the basis of losses that are causally linked to a defendant's criminal conduct, this proximate cause analysis also provides an appropriate framework for assessing actual fraud loss under the Guidelines. Id. ("[W]e see no reason why considerations relevant to loss causation in a civil fraud case should not apply, at least as strongly, to a sentencing regime in which the amount of loss caused by a fraud is a critical determinant of the length of a defendant's sentence.").

## II.   THE GOVERNMENT'S EFFORTS TO LIMIT PROXIMATE CAUSE ANALYSIS TO SECURITIES FRAUD CASES ARE UNCONVINCING AND UNSUPPORTED

In its response to defendant Woolf Turk's sentencing memorandum, the government attempts to minimize the impact of the cases described above by arguing that proximate cause principles annunciated in these cases apply solely in securities fraud matters. Indeed, while citing no case law to support its position, the government argues in favor of two entirely different

---

[2] Absolute precision in calculating losses is not required, and a sentencing court "need only make a reasonable estimate of the loss." U.S. Sentencing Guidelines Manual § 2B1.1 cmt. n.3(C).

standards of loss analysis in fraud cases: one, in securities fraud cases, by which defendants would be responsible only for losses that their conduct proximately caused; and another, in all other fraud cases, by which defendants would be responsible for all losses, even those that have the most minimal connection to the conduct at issue.

In support of this position, the government rests essentially on three arguments. First, the government contends that because the specific scheme at issue here involved victims whom the government characterizes as "lenders" rather than "equity investors," proximate cause principles do not apply. Gov't Sentencing Memorandum at 5-6. Second, the government asserts that if proximate cause principles were to be applied in this case, such principles would be "extended for the first time" outside of the securities fraud context. Gov't Sentencing Memorandum at 5-6. And third, citing an isolated phrase from the Ebbers decision, the government argues that even under Ebbers, the fact that victims would have refused to lend their money had they known the truth about the fraud scheme requires that the defendant be held responsible for the full amount of the victims' losses. Gov't Sentencing Memorandum at 7. Each of these arguments is addressed in turn below, and each is without merit.

### A.     In Calculating Loss Under Guidelines Section 2B1.1, There is No Distinction Between Schemes Involving "Lender" Victims and "Equity Investor" Victims

The government's first effort to differentiate this case from Ebbers and its progeny is premised on the assertion that while the victims in Ebbers were "equity investors" who knowingly engaged in risky investments, Woolf Turk's victims were unsuspecting "lenders." In fact, the government goes to some length to point out the purported differences in the expectations and degree of sophistication of these two types of victims. Specifically, the government states that "shareholder[s] investing in stock or other equities . . . embrac[e] a degree

of risk," and are "aware that both market forces and the acts of management can affect [their] investment," Gov't Sentencing Memorandum at 5-6, while the victims in this case are described as "lenders" who "believed they were making a very safe investment" and "had no inkling that they could suffer the kind of downside that they have suffered." Id. at 6, 12.

It is hardly a controversial proposition that lenders and equity investors have different expectations and assume different risks; that is not a point of reasonable contention. However, to the extent the government intends to argue that this distinction makes any sort of meaningful difference for sentencing purposes, the basis for that position is hardly clear. Indeed, while drawing a distinction between lenders and investors is easily accomplished, using that distinction to justify fundamentally disparate treatment of defendants in fraud cases is not, and in the government's brief, this latter issue goes unaddressed.

In any event, the government's argument in favor of disparate, case-dependent standards of loss causation fails for two basic reasons: (1) neither Section 2B1.1 nor the related case law distinguishes between lenders and equity investors for purposes of loss calculations; and (2) the government's distinction would conflict with fundamental principles underpinning the Guidelines.

Section 2B1.1 governs the loss calculation for all fraud-based crimes. See U.S. Sentencing Guidelines Manual ch.2, pt. B, Introductory Comment (2008) ("These sections address basic forms of property offenses: theft, embezzlement, fraud, forgery, counterfeiting, … insider trading, transactions in stolen goods, and simply property damage or destruction."). Where there is no intended loss, the relevant Guidelines level is determined by examining the "actual loss," and, as discussed above, the "actual loss" analysis carries with it the loss causation principles embodied in Application Note 3(A)(i). The government does not point to any

9

provision of the Guidelines that would restrict the use of the relevant application note to only securities fraud cases, and in fact, no such provision exists.  To the contrary, the only types of matters in which there are unique provisions regarding the determination of actual loss are specifically identified in Application Note 3(F) to Section 2B1.1, and these type of matters - i.e., credit card fraud, government benefits, and Davis-Bacon violations – are not relevant here.  In any event, even these special rules for determining actual loss in Application Note 3(F) do not eliminate, modify, or address in any way the proximate cause requirement that is found in the application notes.  Thus, to the extent the government argues that securities fraud cases should have their own unique loss causation standard under the Guidelines, that argument cannot be squared with the Guidelines themselves.

Case law also lends the government no support.  Nowhere in the case law discussing proximate causation requirements – whether in Ebbers and its progeny, or elsewhere – have courts drawn a distinction between lenders and equity investors, relied on a unique aspect of the securities market to justify their reasoning as to the applicable causation requirements, or otherwise sought to limit their holdings to securities-related matters.  In fact, even the government's attempt to characterize this matter as a loan case rather than a securities fraud case is unavailing, for while Guidelines determinations in loan fraud cases were previously governed by Section 2F1.1, see, e.g., U.S. v. Confredo, 528 F.3d 143 (2d Cir 2008), that section of the Guidelines was deleted by consolidation with Section 2B1.1, and the proximate cause principles embodied in Section 2B1.1 therefore apply to all cases involving the fraudulent procurement of loans.  U.S. Sentencing Guidelines Supplement 2 App. C, Amendment 617 (November 1, 2001).

Additionally, the fact that neither the Guidelines nor the courts have advanced or adopted the distinction the government advances is not surprising because the distinction is inconsistent

with one of the major purposes of loss determination under the Guidelines – "to serve as a rough measurement of the seriousness of the offense and culpability of the offender." U.S. Sentencing Guidelines Supplement 2 App. C, Amendment 617 (November 1, 2001). Expanding the scope of loss potentially attributable to one defendant but not another, based solely on arbitrary distinctions between the specific type of fraud the defendant committed, is fundamentally at odds with this basic principle. Similarly, precluding all but a small class of fraud defendants from invoking loss-causation principles is hardly consistent with the imposition of sentences that appropriately measure culpability.

The Tenth Circuit's recent decision in United States v. Nacchio, 573 F.3d 1062 (10th Cir. 2009), underscores this point. In Nacchio, an insider trading case in which the Guidelines are driven by gain rather than loss, the court reversed a district court's sentencing calculation because the district court had "ignored the myriad of factors unrelated to [the defendant's] criminal fraud that could have contributed to the increase in the value of the securities." Id. at 1074. Addressing the policy considerations underlying its ruling, the Tenth Circuit provided the following explanation of why proximate cause considerations are fundamental to the sentencing system:

> [I]f the impact of unrelated twists and turns of the market is ignored in the sentencing calculus then an insider trading defendant is likely to suffer a sentence that is detached from his or her individual criminal conduct and circumstances. And this detachment can have a profound, detrimental impact on another objective of federal sentencing – the elimination of unwarranted disparities between similarly situated defendants…. Therefore, from a policy perspective, it makes sense to adopt a sentencing approach that is focused on a defendant's criminally culpable conduct and has the effect of excising – even if not completely – unrelated market forces from the sentencing calculus, thereby narrowing the zone of unpredictability in sentencing.

Id. at 1081-82; see also Wayne R. Lafave, Substantive Criminal Law, § 6.4(c) (2d ed. 2003) ("the requirement of [legal] causation in criminal law, more often than not, serves not to free defendants from all liability, but rather to limit their punishment consistent with accepted theories of punishment").

Here, under the government's argument, only those fraud defendants who happened to commit fraud in the securities markets would be able to invoke proximate cause principles, and only that narrow class of defendants would be able to exclude losses that were caused by "unrelated twists and turns of the market." Id. In all other fraud cases, defendants would be sentenced based on even those losses that were caused by outside forces, and such defendants would thus "suffer . . . sentence[s] that [are] detached from [their] individual criminal conduct and circumstances." Id. The harm this disparate treatment would have upon the sentencing system is clear, as are the unfair consequences it would have upon defendants. The government's efforts to impose limits on proximate cause principles are thus not only unjustified, but unjust as well.

**B.      The Application of Proximate Cause Principles in All Fraud Cases is Not a Novel Extension of the Law**

As a further part of its effort to minimize the significance of Ebbers and Rutkoske, the government next argues that proximate cause principles "should not be extended for the first time from the limited context of securities fraud." Gov't Sentencing Memorandum at 5. Contrary to the government's suggestion, however, the proximate cause principles articulated in those cases have never been limited only to securities fraud matters.

In noting the unremarkable principle that the loss attributed to a defendant in a fraud case "must be the result of the fraud," the Second Circuit in Ebbers cited to a single case – the Fifth Circuit case of U.S. v. Olis, 429 F.3d 540. Ebbers, 458 F.3d at 128. A review of Olis thus

12

provides important background to understanding the proximate cause analysis that the Second Circuit conducted in Ebbers.

Olis worked as a tax lawyer and accountant for a company called Dynegy. He, along with others, implemented an accounting scheme that was designed to generate artificial positive cash flow for Dynegy. The Securities and Exchange Commission learned of the scheme and required the company to restate the cash flow, which adversely affected the company's stock price. Eventually, Olis pleaded guilty to securities fraud, mail and wire fraud, and conspiracy and was sentenced to 292 months in prison. On appeal, Olis argued that the district court erred in part because while there were multiple causes for the loss in the value of the stock, the court improperly considered the entire decline in stock value that occurred the week immediately after the fraud was disclosed. The government, on the other hand, argued that the district court properly considered the entirety of the stock decline because the definition of "actual loss" requires only "but for" causation and "obviates the need to read the doctrine of proximate causation into § 2B1.1...." Brief of Plaintiff-Appellee at 107, Olis, 429 F.3d 540 (No. 04-20322).

Rejecting the government's argument, the Fifth Circuit in Olis stated that "preexisting standards . . . h[old] a defendant responsible at sentencing only to the extent that losses are caused directly by the offense conduct," and ruled that the definition of "actual loss" in Section 2B1.1 does not "lessen" those settled standards. Olis, 429 F.3d at 546-47. The Fifth Circuit also went on to note in Olis that "[d]istrict courts must take a 'realistic, economic approach to determine what losses the defendant truly caused or intended to cause." Id. (citing U.S. v. West Coast Aluminum Heat Treating Co., 265 F.3d 986, 991 (9th Cir. 2001)).

In ruling in <u>Olis</u> that, under "preexisting standards," defendants are responsible at sentencing "only to the extent that losses are caused directly by the offense conduct," 429 F.3d at 545-46, the Fifth Circuit in turn relied upon two cases: <u>U.S. v. Hicks</u>, 217 F.3d 1038 (9th Cir. 2000) and <u>U.S. v. Marlatt</u>, 24 F.3d 1005 (7th Cir. 1994). Notably, although the government contends in its papers here that loss causation principles have not previously been extended to non-securities fraud matters, *neither <u>Hicks</u> nor <u>Marlatt</u> involved securities fraud.* Additionally, because the <u>Marlatt</u> decision is particularly helpful in illustrating how courts have applied proximate cause principles in non-securities fraud matters prior to <u>Ebbers</u> and <u>Rutkoske</u>, we discuss that case in detail here.

Marlatt, who was the owner of a title company in northern Wisconsin which sold title insurance written by Ticor Title Insurance Company, bought a resort hotel at a foreclosure sale with the idea of selling time-shared condominium units in it. <u>Marlatt</u>, 24 F.3d at 1006. He sold the units, and through his title company, issued to each purchaser a title insurance policy written by Ticor. <u>Id.</u> Each policy represented that the purchaser was obtaining clear title. <u>Id.</u> Marlatt knew, but did not tell either the purchasers or Ticor, that actually the titles were heavily encumbered by liens for unpaid taxes, judgments, and mortgages. <u>Id.</u> Eventually Ticor discovered what had happened and spent $476,000 to eliminate the liens and thus clear the titles. Meanwhile the value of the property had plummeted. <u>Id.</u> The purchasers of the units threatened to sue Ticor for fraud. <u>Id.</u> To avert such a suit, Ticor decided to buy all the units from the purchasers at the price at which the purchasers had bought them from the defendant. <u>Id.</u> This was done at a cost of $565,000, which the district court added to the $476,000 to compute the total loss caused by the fraud. <u>Id.</u>

In considering Marlatt's appeal, the Seventh Circuit explained that there is a

> difference between 'but for' causation and the causation – for
> which the presence of but-for causation is ordinarily a necessary
> condition but rarely a sufficient one – that imposes legal liability.

Marlatt, 24 F.3d at 1007.  The court in Marlatt noted that this "distinction runs throughout the law," and stated that "[c]riminal law is no exception."  Id.  Applying this principle to the case before it, the court concluded that although Marlatt's conduct may have been the "but for" cause of the losses suffered by Ticor when it bought properties from the individuals who had previously obtained it from the defendant, Marlatt's fraud was not the proximate cause of this loss.  Id.  To the contrary, the court stated, the loss in value may have been caused by "a collapse of the local recreational real estate market, business mistakes by the defendant, some unrelated fraud by the defendant, or a completely extraneous event," but it was not caused by the defective title insurance policies that Marlatt had issued.  Id.  Consequently, because the district court had improperly used but-for causation principles to sentence Marlatt based on losses he did not proximately cause, the Seventh Circuit reversed and remanded the matter for resentencing.

Subsequent to the Seventh Circuit's decision in Marlatt, the rule that it enunciated  – that a defendant's conduct must be more than simply the "but for" cause of the loss – was explicitly incorporated into the Guidelines.  In 2001, the Sentencing Commission amended the Guidelines and defined "actual loss" under Section 2B1.1 as "the reasonably foreseeable pecuniary harm that resulted from the offense."  U.S. Sentencing Guidelines Manual § 2B1.1 cmt. n.3(A)(i).  In text explaining the basis for the amendment, the Commission clearly stated that its amended definition of "actual loss" was intended to incorporate principles of proximate causation.

Specifically, the Sentencing Commission stated that the new actual loss definition

> incorporates [a] "causation standard that, at a minimum, requires factual causation (often called "but for" causation) <u>and provides a rule for legal causation</u> (i.e., guidance to courts regarding how to draw the line as to what losses should be included and excluded from the loss determination).

U.S. Sentencing Guidelines Supplement 2 App. C, Amendment 617 (November 1, 2001) (emphasis added).  Further, the Sentencing Commission stated that it was "entrust[ing] sentencing judges" to apply this loss causation standard "in the great variety of factual contexts in which it is expected to occur." <u>Id.</u>  Thus, notwithstanding the arguments the government now asserts, the Sentencing Commission plainly intended and anticipated that loss causation principles would be applied in a "great variety of factual contexts," and nowhere did the Commission indicate that those contexts would or should be limited to cases involving securities fraud.  In fact, in the very text by which it explained the actual loss standard and the proximate cause provisions that were adopted along with it, the Sentencing Commission cited the non-securities fraud case, <u>Marlatt,</u> that we have already discussed above.

Against this backdrop, the government's argument rests on a faulty premise.  Application of proximate cause principles in cases like the one now before this Court would not represent the "exten[sion]" of those principles "for the first time."  To the contrary, principles of proximate causation have already been applied in non-securities fraud matters, the Sentencing Commission intended them to be applied in non-securities fraud matters, and there would hardly be anything remarkable or unprecedented about their application here.

**C.     The Government Misapprehends *Ebbers* In Attempting to Apply But-For Causation**

In a final argument in support of its efforts to avoid the application of proximate cause principles, the government states that even under <u>Ebbers,</u> the defendant here would still be liable

for the entire amount of the loss.  In particular, the government's brief cites <u>Ebbers</u> for the proposition that "the essential question here is whether the Court can 'accurately asses what [the victims'] conduct would have been had they known the truth.'" Gov't Sentencing Memorandum at 7 (citing <u>Ebbers</u>, 458 F.3d at 127).  The government then argues that had the investors in this case "been told that their mortgages would be subordinate to the over $50 million in mortgages taken out from institutional lenders, the victims would not have lent their … funds to the defendant."  <u>Id.</u>  This, according to the government, requires that the defendant be held accountable for the full amount of the victims' losses, without regard to principles of proximate causation.

The language the government excerpts is taken out of context, and simply is not the test for determining loss under <u>Ebbers</u> or Section 2B1.1.  In describing why the amount of loss is "no easy task" to determine where a fraud in investments is concerned, the Second Circuit wrote the following statement upon which the government now relies:

> The loss to investors who hold during the period of an ongoing fraud is not easily quantifiable because we cannot *accurately assess what their conduct would have been had they known the truth.*  However, some estimate [of the loss] must be made for Guidelines' purposes, or perpetrators of fraud would get a windfall.

<u>Ebbers</u>, 458 F.3d at 127 (emphasis added).   Based on its argument here, the government appears to treat this language as creating a basic method for loss-analysis in fraud cases:  if a victim who learned the truth about a fraud would not have permitted himself to be defrauded, then the defendant must be held responsible for all losses the victim suffered, regardless of the degree of their connection to the offense.  Yet that is hardly what the Second Circuit stated.  Rather than establishing the simplistic test the government now seeks to establish, the foregoing passage simply explained the difficulties of determining loss in a fluid securities market that involves

investors who act and do not act for a range of different reasons. Moreover, in a passage that followed, the court then established the operative principles that the government seeks to avoid: "The loss must be the result of the fraud . . . . Losses from causes other than the fraud must be excluded." Id. (citation omitted).

In addition to taking language from Ebbers out of context, the government's argument on this point also ignores what we have shown above to be well-settled principles. In fact, while the government is of course correct that most victims of a fraud would not permit themselves to be defrauded if they knew of the truth, that does not mean that all losses the victim suffered were proximately caused by the defendant. Stated differently, the government's argument appears to be that if a victim would not have suffered losses but for the defendant's offense, then the defendant is responsible for the entirety of those losses. However, the notion that sentences should be based solely on principles of but-for causation has already been rejected by the Sentencing Commission and the courts. But-for causation is not the law, it is inconsistent with the principles that underlie the Guidelines, and despite the government's arguments, it should not be re-implemented here.

## III. APPLICATION OF PROXIMATE CAUSE PRINCIPLES WILL AVOID UNJUST RESULTS THAT CONFLICT WITH THE PURPOSES OF THE GUIDELINES

In light of the government's argument that proximate causation principles should be applied only in the securities fraud context, the practical effect that such a limitation would have upon sentencings in this circuit also merits discussion.

As district courts within this circuit have acknowledged, "the guidelines' fetish with abstract arithmetic" places an overwhelming emphasis on the amount of loss caused by a fraud defendant's offenses in arriving at a sentencing range. Adelson, 441 F. Supp. 2d at 512; Parris, 573 F. Supp. 2d at 746. This emphasis on loss amount comes at the expense of accounting for

the particular "character and magnitude" of each individual fraud, and results in advisory

Guidelines sentences that, if imposed, would inappropriately punish relatively modest frauds

with the same types of lengthy, harsh sentences that are arguably appropriate only in cases

involving dramatically more egregious schemes.  See Parris, 573 F. Supp. 2d at 746 (noting that

the Guidelines would impose harsher punishment on defendants guilty of "a rather typical

'pump-and-dump' scheme in the world of the high-risk penny investor" than on the defendants in

Enron and WorldCom, whose conduct "wreak[ed] unimaginable losses on major corporations

and, in particular, on their companies' employees and stockholders, many of whom lost their

pensions and were financially ruined").

Moreover, the Guidelines give such heavy weight to fraud loss that consideration of the

nature and larger impact of a fraud is necessary for the Guidelines to be "cabined by common

sense."  Adelson, 441 F. Supp. 2d at 512.  In such cases, "where . . . the calculations under the

guidelines have so run amok that they are patently absurd on their face, a court is forced to place

greater reliance on the more general considerations set forth in section 3553(a), as carefully

applied to the particular circumstances of the case and of the human being who will bear the

consequences."  Id.; Parris, 573 F. Supp. 2d at 754 (holding, in a white collar case, that "common

sense" should inform courts' consideration of the Guidelines where a strict application of the

Guidelines would result in an unjust sentence).

Accordingly, in this and all other cases in which the advisory Guidelines are dramatically

driven by loss, we submit that the application of proximate cause principles (together with a full

and careful consideration of the 3553(a) factors) is essential to the imposition of a just and

reasonable sentence.  Conversely, were courts to adopt the government's position that proximate

cause principles apply solely to securities fraud matters, we submit that the result would be the

types of harsh and lengthy sentences that undermine the legitimacy of the sentencing system and punish defendants well beyond that which justice requires.

## CONCLUSION

For the reasons given above, the NACDL, the NYSACDL, and the NYCDL respectfully submit that the Court should analyze actual loss under the Guidelines based upon a proximate causation test.

Dated: New York, New York
      October 19, 2009

Respectfully submitted,

MORVILLO, ABRAMOWITZ, GRAND,
 IASON, ANELLO & BOHRER, P.C.
565 Fifth Avenue
New York, NY 10017
(212) 856-9600

By: _____
     Lawrence S. Bader
     Robert M. Radick
     Claudio Ochoa

RICHARD D. WILLSTATTER
Vice-Chair, Amicus Curiae Committee
NATIONAL ASSOCIATION OF CRIMINAL DEFENSE
LAWYERS
Vice-President
NEW YORK STATE ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS

Barry A. Bohrer
President
NEW YORK COUNCIL OF DEFENSE LAWYERS

*Attorneys for the National Association of
Criminal Defense Lawyers, the New York State Association
of Criminal Defense Lawyers, and the New York Council of
Defense Lawyers*